WhitaeeR, Judge,
delivered the opinion of the court:
The plaintiff sues to recover transportation charges allegedly due him for services performed during the period from July 8, 1944 to August 16, 1945, under a contract for the transportation by plaintiff of aviation gasoline in tractor tank-trailer units from the Phillips Petroleum Company Refinery near Borger, Texas, to United States Army Air Corps bases at Liberal, Kansas, Pratt, Kansas, and Sears Junction, the latter located about 5 miles west of Dodge City, Kansas.
Prior to the contract, plaintiff had been engaged in the transportation of aviation gasoline, with headquarters in Plainview, Texas, but in the latter part of June 1944, he discontinued operations, parked his equipment at his headquarters, and proceeded with efforts to sell it.
Shortly thereafter he received a telephone call from Captain Edwin Phelps, the Transportation Officer for the Ama *432 rillo Air Transportation Office, whose duty it was to coordinate the activities of the refineries, the carriers, and the various airfields in the movement of gasoline from refineries to bases throughout the southwest, asking him to attend a meeting of motor carriers concerning a shortage of gásoline at the three Kansas air bases referred to above due to an accelerated training program. The rail and motor carriers engaged in hauling gasoline to these bases were not able to meet the increased demand, and the meeting was called to devise means of relieving the shortage.
The meeting, which was held in Amarillo, Texas, on July 7, 1944, was attended by plaintiff, his brother, and by representatives of some 15 or 20 other motor carriers. The following Government officials were also present: Major Lawrence B. Freeman, Chief of the Petroleum Traffic Branch of the Traffic Section at Wright-Patterson Field; Charles E. Cranmer, Liaison Officer between the Tank-Truck Division of the Office of Defense Transportation and the Army Air Corps at Dayton, Ohio; H. C. Mims, Amarillo District Supervisor for the Interstate Commerce Commission; John J. Van Pelt, Maintenance Specialist of the Office of Defense Transportation at Amarillo; Lieutenant Colonel J. L. Elliott, Chief of Transportation for the Air Service Command at Wright-Patterson Field; Captain Phelps, and a Major Strauss.
At the outset of the meeting, it developed that plaintiff was the only truck operator present with whom the Government was willing to enter into a contract because he was the only one able to produce evidence of ownership of his equipment, and so the general meeting was recessed, and plaintiff was invited to attend a closed meeting with the Government officials named above, which he did.
After considerable discussion the parties reached an agreement by which the plaintiff was to haul the gasoline from the Phillips Refinery to the three Kansas bases at rates equivalent to rail rates. Although the exact amount of the rates was not specified, Mr. Mims, of the Interstate Commerce Commission, advised plaintiff that rates equivalent to rail rates would be approximately one cent per gallon per 100 miles.
*433 It was also agreed that plaintiff would immediately move Ms equipment, maintenance facilities, and operating crews to Borger, Texas, near which the Phillips Refinery is located, and would thereafter have available at all times a minimum of 28 trucking units for the purpose of transporting gasoline when called upon to do so by the Air Corps. It was further agreed that plaintiff would be paid demurrage at the rate of $5.00 per hour for all time, in excess of one hour of free time, required to complete the loading of each unit after the Air Corps had directed plaintiff to send the unit to the Phillips Refinery, and to complete the unloading of each unit after it arrived at the point of delivery.
Immediately after the meeting of July 7, 1944, plaintiff moved all his equipment to Borger in accordance with the agreement, and on July 8, 1944, began hauling gasoline for the Air Corps.
Plaintiff sues for the difference between the amounts that have been paid him and amounts equivalent to rail rates. Defendant insists that for the period after September 16 plaintiff is entitled to no more than the rates set out in the letter dated September 18, 1944, and signed by plaintiff’s bookkeeper. We are of opinion that neither position is correct, but that plaintiff is entitled to the rates set out in the tariffs filed by him and issued by the Interstate Commerce Commission, which, it turned out, were less than rail rates.
At the meeting on July 7 it was understood that Mr. Mims and Captain Phelps would prepare and have filed for plaintiff a temporary tariff providing for the rates that had been agreed upon at the meeting, and would assist plaintiff in obtaining the permits required by him for operating over the routes involved. Accordingly, Captain Phelps and Mr. Mims prepared a temporary tariff for plaintiff, which was filed with the Interstate Commerce Commission on July 17, 1944, and issued, effective July 11,1944. It established a rate of 1.20 cents per gallon on gasoline hauled from Phillips, Texas, to the base at Liberal, Kansas, and a rate of 1.98 cents per gallon on gasoline hauled from Phillips to the base near Dodge City, Kansas. These rates were supplied by Mr. Mims and were apparently computed on the basis of a cent *434 per gallon per 100 miles, although, there was a slight error in the highway mileage used in making the conversion.
It appears that all persons involved believed that the rates appearing in the temporary tariff were equivalent to rail rates. It was not until after plaintiff had filed this action in 1950 that he learned that the rates published in this and a subsequent tariff were less than rail rates. The parties have stipulated that the rail rates actually in effect at the time the gasoline was transported were equivalent to 1.716 cents per gallon from the refinery to Liberal, Kansas, and 2.244 cents per gallon from the refinery to Dodge City, Kansas.
On July 22,1944, plaintiff, through his own attorney and with the assistance of Mr. Mims, filed an application with the Interstate Commerce Commission for authority to transport gasoline to the bases at Liberal and Dodge City, Kansas, and requested authority to publish a tariff providing for the same rates as were specified in the temporary tariff previously filed. On August 5, 1944, the Interstate Commerce Commission denied plaintiff’s request, because the Transportation Corps of the Army Service Forces had objected to the proposed rates, but later, after the Transportation Corps had withdrawn its objections, at the request of the Air Corps, the Interstate Commerce Commission entered an order on August 23, 1944, authorizing plaintiff to publish and file with the Commission a new tariff, which was issued on September 1, 1944, effective September 5, 1944. The rates set out in this tariff were the same as those appearing in the earlier temporary tariff.
At about the same time this tariff was approved, Captain Phelps notified plaintiff that he had received complaints from the Transportation Corps that the rates charged by plaintiff and other carriers in that territory were excessive and out of line with rates charged by carriers elsewhere. Captain Phelps informed plaintiff that he would have to reduce his rates to 14 cents per running mile plus a terminal charge of $8.40 based on a load of 4,000 gallons. The plaintiff stated that he could not do so without suffering a substantial loss, and he refused to do so at that time.
*435 At the meeting on July 1, 1944, there bad been discussed the possibility of a lease of Government-owned tractor-trailer units to carriers who were hauling gasoline to the air bases. Later in the summer of 1944, Captain Phelps informed plaintiff that when the units were received, plaintiff would be permitted to rent twelve of them; but after receipt of about 60 of these units, Captain Phelps telephoned plaintiff’s office in Plainview and stated to plaintiff’s bookkeeper that he would have to have a letter from plaintiff agreeing to the rate of 14 cents a running mile and a terminal charge of $8.40 before the Air Corps would consider leasing any of the surplus equipment to plaintiff. He then dictated the following letter over the telephone, and requested that it be executed either by or for plaintiff. Plaintiff’s bookkeeper typed and signed the letter and mailed it to Captain Phelps on September 18,1944. The letter reads:
NewMAN Motor Co.
Plainview, Texas
September 18, 1944.
Major EdwiN F. Phelps,
Transportation Officer,

Army Air Force, Transportation Office,

Amarillo, Texas.

Dear Sir : This is to advise we have started transporting gasoline from Borger, Texas to Liberal and Dodge City Army Air Bases on the 14 cents per mile plus $8.40 rate based on load of 4000 gallons. We have instructed our attorney to file new Tariffs, which will be done immediately.
This new rate as per our agreement will become effective as of Sept. 16,1944.
Yours Truly,
Newman Motor Co.
By: /s/ L. F. LaFoNT.
It is not shown that plaintiff’s bookkeeper had authority to write this letter and plaintiff denies that he did have.
There is a direct conflict in testimony as to just what agreement, if any, was reached by plaintiff and Captain Phelps in discussions prior to and after the mailing of the letter set out above. The greater weight of the evidence, however, is that, if any agreement was reached, it was that if the 12 Government-owned units were leased to plaintiff on terms *436 quoted to Mm, be would make the rates set out in the above letter applicable to all units operated by him in transporting gasoline to the bases; but this agreement never went into effect because the 12 units were not leased to plaintiff, since an inspection by Captain Phelps revealed that the tractors were not suitable for use on the highways. Hence, plaintiff did not file the new tariffs referred to in the letter, but, until May 26,1945, continued operating under the tariff issued on September 1,1944. On May 26,1945, he agreed to reduce his charges to the amount insisted upon by defendant and filed a tariff accordingly, effective July 1, 1945, wMch remained in effect for the rest of the time.
(Later, on February 1, 1945, plaintiff and defendant entered into a written lease-contract by which defendant leased to plaintiff four 4,000-gallon trailers, but the terms of this lease were different from the terms upon which it had been proposed to lease the 12 units and it is not shown that this lease had any connection with plaintiff’s charges for transporting gasoline in his own trucks.)
Bills of lading covering all the gasoline transported by plaintiff were issued by Captain Phelps’ office, and rates used in compiling plaintiff’s bills were supplied by Captain Phelps. Until September 15, 1944, the rates supplied by Captain Phelps and used by plaintiff in computing his bills were the rates provided in his tariffs. From September 16, 1944 (the date specified in plaintiff’s letter of September 18, 1944), until plaintiff ceased transporting gasoline, the rates supplied by Captain Phelps and used by plaintiff were based upon figures of 1.05 cents per gallon, instead of the tariff rate of 1.20 cents, for transportation of gasoline from the refinery to the base at Liberal, Kansas, and 1.68 cents per gallon, instead of the tariff rate of 1.98 cents, on shipments from the refinery to the base at Dodge City, Kansas. These figures were apparently computed on the basis of the rates mentioned in the above letter, i. e.j 14 cents per mile plus $8.40 based on a load of 4,000 gallons.
Plaintiff frequently protested the payment of rates which were less than those appearing in his tariffs, and stated that when the work was completed he intended to file a claim for the difference between what he was being paid and the *437 amount lie was entitled to on tlie basis of the agreement concluded at the meeting of July 7, 1944. On April 28, 1948 be filed such a claim.
We do not think plaintiff is limited to the rates set out in the letter of September 18, 1944, nor to the amounts set out in the invoices, as more fully stated hereinafter.
Since plaintiff’s petition was not filed until September 18, 1950, all of his claim is barred by the statute of limitations, except for charges for the transportation services performed between September 19, 1944 and August 16, 1945, both dates inclusive. All gasoline hauled to the base at Pratt, Kansas, was transported prior to September 19, 1944, and, hence, a claim based thereon is barred.
As stated, plaintiff seeks to recover the difference between the amount he actually received for transporting the gasoline and the amount he would have received had he been paid on the basis of rates equivalent to rail rates. Plaintiff also seeks to recover demurrage at the rate of $5.00 per hour. Defendant says plaintiff is not entitled to recover more than the amounts set out in the letter of September 18,1944, or, in any event, not more than an amount computed on the basis of the tariffs filed by or for him.
The plaintiff alleges that the agreement made at the meeting of July 7,1944, by which he was to receive the equivalent of rail rates for transporting the gasoline, governed during the entire period. We do not think so, because the Government representatives present at this meeting only had authority to enter into a temporary agreement as to rates, since final responsibility as to rates rested with the Chief of Transportation of the Army by virtue of Army Begulation 55-105 then in effect. The pertinent part of this regulation reads as follows:
d. Negotiations with carriers relative to classification of commodities, including raw materials as well as finished products, terminal charges, switching charges, arbitrary charges, rates and fares, matter in tariffs, adjustments in connection with such matters, and policies pertaining to freight, passenger, or express shipments are the responsibility of the Chief of Transportation and all correspondence other than routine on these subjects will be referred to him.
*438 e. All communications respecting special rate quotations, rate equalization, embargoes, terminal facilities, switching or delivery arrangements, and unusual traffic conditions received from carriers by an officer in the field or in Washington, D. C., will be submitted promptly to the Chief of Transportation.
f. No funds or personnel will be used in military establishments for the purpose of maintaining rate tariffs except in the Transportation Corps and the Finance Department.
g. The Chief of Transportation may delegate such authority and duties as he deems proper and necessary.
Plaintiff claims that he had no knowledge of this Army Regulation, but this is immaterial because it is settled that he who enters into an agreement with the Government takes the risk that those who purport to act for the Government have the authority to do so. This is true even though the representatives of the Government may have been unaware of the limitations on their authority. Federal Crop Insurance Corp., v. Merrill, 332 U. S. 380, 384; Whiteside v. United States, 93 U. S. 247, 257.
In accordance with the agreement arrived at on July 7, 1944, plaintiff began operations under a temporary tariff, due to expire in August of that year. On July 22,1944, plaintiff requested authority from the Interstate Commerce Commission to publish a permanent tariff, but this request was denied on August 5, 1944, because the Transportation Corps of the Army Service Forces, which had the sole authority to act in the matter of rates, objected to the rates requested by plaintiff. It is our opinion that the temporary agreement entered into on July 7, 1944, was at an end on the effective date of the superseding tariff agreed to by the Transportation Corps.
On September 1, 1944, the Transportation Corps withdrew its objections to the tariff filed by plaintiff, and the Interstate Commerce Commission approved it. This specified the same rates specified in the temporary tariff. This tariff was effective as of September 5,1944, and plaintiff operated under it until a new tariff went into effect on July 1, 1945.
It is our opinion that plaintiff was entitled to charge the rates appearing in this tariff for the entire period during which that tariff remained in effect. Although no express *439 contract was entered into, we are of opinion that the parties impliedly agreed to the rates appearing in this tariff. The Transportation Corps, by withdrawing its objections to the tariff filed by plaintiff, indicated that the rates in the tariff were satisfactory to it. Plaintiff by filing the tariff agreed to the rates. Whether or not they were the equivalent of rail rates, they were satisfactory to plaintiff. Also, the agreement on rail rates was binding only for the temporary period. Nor did defendant make any definite representation that the rates set out in the temporary tariff, adopted by plaintiff in fixing permanent rates, were the exact equivalent of rail rates.
Defendant contends that plaintiff, by the letter of September 18, 1944, agreed to haul the gasoline at rates lower than those appearing in the tariff issued on September 1, 1944. We do not agree with this contention. The letter was dictated over the telephone to plaintiff’s bookkeeper by Captain Phelps, the defendant’s agent, and signed by plaintiff’s bookkeeper. Plaintiff denies his bookkeeper had authority to write the letter, and defendant does not prove his authority. Defendant has not proven that plaintiff himself agreed to these rates until he filed his tariff on May 26, 1945 setting them out. This is the earliest date upon which plaintiff’s agreement to them is shown. That plaintiff signed invoices based on these lower charges is not evidence of his agreement to them, because the invoices were prepared by defendant’s agent, and plaintiff constantly protested against the charges so computed.
We are of opinion that plaintiff should have received payment based on the rates appearing in his tariff of September 1,1944, for as long as it remained in effect. After the effective date of the new tariff filed on July 1,1945, he is entitled to the rates fixed therein.
The parties have stipulated that plaintiff would have received $45,067.96 more than he actually received, had he been paid at the rates provided for in his tariffs on file from September 19, 1944 to August 16, 1945. Plaintiff is entitled to recover that amount, less the offset mentioned later. His claim prior to September 19,1944, is barred by the statute of limitations.
*440 The second problem presented for our consideration is plaintiff’s claim for demurrage. The record reveals that plaintiff’s trucks were often delayed in loading and in unloading during the time he hauled gasoline for the defendant. These delays were caused by a number of factors such as inadequate storage facilities at the bases and bad weather.
At the meeting of July 7, 1944, it was agreed that plaintiff would be paid demurrage at the rate of $5.00 per hour for all time, in excess of one hour of free time, required to complete the loading of each unit after it arrived at the refinery, and for all time, in excess of one hour of free time, required to complete the unloading of each unit after it arrived at the point of delivery. However, for reasons previously stated in this opinion, the agreement of July 7, 1944, was only a temporary agreement, and was not binding upon the defendant beyond the period of time that the temporary agreement remained in effect, which was until September 5, 1944.
There was no provision for demurrage in any of the tariffs filed by or for the plaintiff. The evidence does not clearly reveal the reason for this omission, but apparently it was ■because he did not claim it, since he never billed defendant for it while he was transporting the gasoline. Besides, under the arrangement plaintiff was required to keep 28 units at defendant’s disposal and could use them for no other purpose; hence, it made but little difference to plaintiff whether the trucks were standing in his yard or were waiting to be loaded or unloaded.
Moreover, plaintiff kept no records of the number of hours required to load and unload his units and he has given us no basis upon which to estimate such time. In any event, this claim must fail for want of proof.
Plaintiff alleges that it was agreed at the meeting of July 7, 1944, that he should receive demurrage at $5.00 per hour for all the time that his units were parked at Borger, Texas, as well as for the time, in excess of the free time allowed, required to load and unload his units. He claims he is due the total amount of $712,420.27 for the time his trucks were idle. We reject this claim for two reasons: (1) the evidence does not reveal that the parties ever agreed that plaintiff should *441 receive demurrage for the time that his units were standing idle at Borger; (2) even if such an agreement was made, it was temporary only and not binding on defendant during the period of time not barred by the statute of limitations.
For the reasons stated, we must deny plaintiff’s claim for demurrage.
On June 24, 1945, two of the Government-leased trailers and an accompanying dolly were damaged beyond repair while being operated by the plaintiff. Plaintiff admits that he is liable to defendant in the sum of $9,668.49 for the loss of this equipment. He also admits that he is liable in the sum of $295.26 for a load of gasoline that was lost when a truck overturned on August 2, 1944. These sums must be deducted from the $45,067.96 due plaintiff for transporting the gasoline.
The plaintiff is entitled to recover $35,109.21. Judgment for this amount will be entered.
It is so ordered.
Laramoee, Judge; Madden, Judge; LittletoN, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes the following findings of fact:
1. The plaintiff, a citizen of the United States and a resident of Plainview, Texas, brought this action to recover transportation charges alleged to be due under a contract entered into between plaintiff and defendant for the transportation of aviation gasoline in tractor, tank-trailer units by plaintiff from the Phillips Petroleum Company Befinery near Borger, Texas, to United States Army Air Corps Bases at Liberal, Kansas, Pratt, Kansas, and Sears Junction, which is located about 5 miles west of Dodge City, Kansas, during the period July 8, 1944 to August 16, 1945, both inclusive.
2. The 100-octane aviation gasoline transported by plaintiff was produced at the Phillips Petroleum Company Be-finery at Phillips, Texas, just outside the city limits of *442 Borger. This refinery was the only source of such aviation gasoline in a large area, which included parts of Texas, Kansas, Colorado, and New Mexico. The monthly production of gasoline at the Phillips plant during the period involved here was from 18 million to 20 million gallons per month.
3. During the early part of 1944, plaintiff was engaged in the transportation of aviation gasoline with headquarters at Plainview, Texas, and operated over a large area, including West Texas and parts of Oklahoma. During that time the firm of Schuster & Boren held a contract with the Government for the transportation of gasoline to the Kansas air bases, referred to above, but the firm did not own sufficient equipment to supply these bases. In 1944, prior to July 1, plaintiff had operated by leasing his equipment to Schuster & Boren. At that time, the rate being paid in the area for the transportation of aviation gasoline by motor carrier was about 20 cents per running mile, which is measured from the point of origin to the point of delivery and thence to the point of origin. As used herein, the term “loaded mile” applies to a one-way loaded trip, which is measured only from the point of origin to the point of delivery.
Plaintiff lost substantial sums of money under the lease arrangement with Schuster & Boren and, as a result, he withdrew his equipment from that operation during the latter part of June 1944, parked it at his headquarters in Plainview, Texas, and proceeded with efforts to sell it.
4. During the time he transported gasoline for Schuster & Boren, plaintiff became acquainted with Captain Edwin F. Phelps, Transportation Officer for the Amarillo Air Transportation Office. Captain Phelps had been sent to Amarillo in November 1943 to coordinate the activities of the refineries, the carriers and the various airfields in the movement of gasoline from refineries to air bases throughout the Southwest. His office was responsible for routing the gasoline and distributing it by the fastest possible means with the available equipment. His duties also included rendering assistance to. carriers in obtaining new equipment, tires, and repair parts, and he issued bills of lading covering the shipments of gasoline to the air bases.
*443 5. A short time prior to July 1, 1944, an emergency developed at the three Kansas air bases, referred to above, because of a shortage of aviation gasoline. All three were B-29 bomber bases, where crews were being trained for combat service overseas. Because of the demands of the war, the Army Air Corps had inaugurated a program which called for the transfer of air groups for overseas duty at regular intervals without regard to the number of flying hours the trainees had completed. In order that the student crews could obtain the amount of flying time needed for combat service, the training program was greatly accelerated and the demand for gasoline was substantially increased. Asa result, the rail and motor carriers engaged in hauling gasoline to these bases were not supplying the amount of gasoline needed.
6. After plaintiff’s equipment had been parked for a short time, he received a telephone call from Captain Phelps, who informed him that the gasoline situation at the Kansas bases was very critical and requested plaintiff to attend a meeting of motor carriers that had been called by Phelps’ superiors and was to be held in Amarillo on July 7, 1944. Plaintiff also was requested to bring to the meeting documents showing that he had title to his equipment.
The meeting, which was held at a hotel in Amarillo, Texas, on July 7, 1944, as scheduled, was attended by plaintiff, his brother, and by representatives of some 15 or 20 other motor carriers. The following Government officials were also present: Major Lawrence B. Freeman, Chief of the Petroleum Traffic Branch of the Traffic Section at Wright-Patterson Field, the office in charge of the transportation of gasoline from all sources to all air bases; Charles E. Cranmer, Liaison Officer between the Tank-Truck Division of the Office of Defense Transportation and the Army Air Corps at Dayton, Ohio; H. C. Mims, Amarillo District Supervisor for the Interstate Commerce Commission; John J. Yan Pelt, Maintenance Specialist of the ODT at Amarillo; Lieutenant-Colonel J. L. Elliott, Chief of Transportation for the Air Service Command at Wright-Patterson Field; Captain Phelps, and a Major Strauss. At the outset of the meeting, it developed that plaintiff was the only truck operator pres- *444 exit who was able to produce evidence of ownership of his equipment. Thereupon, the general meeting was immediately recessed, and plaintiff was invited to attend a closed meeting with the Government officials named above.
7. At the time the meeting was held, there was in effect Army Begulation No. 55-105, which provided in pertinent part as follows:
d. Negotiations with carriers relative to classification of commodities, including raw materials as well as finished products, terminal charges, switching charges, arbitrary charges, rates and fares, matter in tariffs,, adjustments in connection with such matters, and policies pertaining to freight, passenger, or express shipments are the responsibility of the Chief of Transportation and all correspondence other than routine on these subjects will be referred to him.
e. All communications respecting special rate quotations, rate equalization, embargoes, terminal facilities, switching or delivery arrangements, and unusual traffic conditions received from carriers by an officer in the field or in Washington, D. C., will be submitted promptly to the Chief of Transportation. ■
f. No funds or personnel will be used in military establishments for the purpose of maintaining rate tariffs except in the Transportation Corps and the Finance Department.
g. The Chief of Transportation may delegate such authority and duties as he deems proper and necessary.
Plaintiff had no knowledge of this regulation, nor were its provisions ever called to his attention. At that time, it was the policy of the Air Corps to authorize the payment of rail rates to motor carriers on a temporary basis and to recommend to the Chief of Transportation of the War Department the permanent rates to be paid, based on the carrier’s actual operating costs over a sufficient period of time to establish average costs.
Both Colonel Elliott and Major Freeman had the authority to enter into a contract with plaintiff as to the rates to be paid for the hauling of gasoline to meet the emergency then existing. At the beginning of the closed meeting, Colonel Freeman stated that he had been authorized to requisition plaintiff’s equipment or to take any other steps that appeared to be necessary for relieving the emergency at the three *445 Kansas air bases. Colonel Freeman then said that the Government preferred not to requisition the equipment, provided the Air Corps could make arrangements to have the gasoline transported at a reasonable rate. He emphasized that the Air Corps would not pay exorbitant rates but stated that it had no objection to paying the equivalent of the rail rate. Although the exact amount of that rate was not specified, Mr. Mims advised plaintiff that a rate equivalent to the rail rates would be approximately one cent per gallon per 100 miles.
Plaintiff informed Major Freeman that he had no objection to hauling the gasoline at a rate equivalent to the rail rates, but said that the principal difficulty encountered by motor carriers in transporting gasoline to the Kansas air bases was the loss of time caused by bad weather and by delays in unloading the tank trailers at the bases. He explained that the gasoline storage facilities at the bases were very small in comparison with the amount of gasoline consumed and that when the loaded trucks arrived there, they frequently had to stand by for two or three days waiting for railway tank cars to be unloaded or until a number of bombers were refueled so as to make storage available. Thereupon, Major Freeman stated the Air Corps would pay plaintiff the prevailing rate for demurrage, which was $5.00 per hour for all time, in excess of one hour of free time, that was required to complete the loading of each unit after the Air Corps had directed plaintiff to send the unit to the refinery. He also stated that demurrage at the same rate would be paid for all time, in excess of one hour of free time, that was required to complete the unloading of each unit after it arrived at the point of delivery.
At the time of the meeting, plaintiff’s headquarters were in Plainview, Texas, and his equipment was parked there. Plainview is located approximately 140 miles southwest of Borger. Colonel Freeman advised plaintiff that it had been estimated that from 25 to 30 units would be required for moving the gasoline needed by the three Kansas air bases. At that time, plaintiff owned some 34 units and had access to an additional 41 units which he was able to lease. Major Freeman informed plaintiff that it would be necessary for plain *446 tiff to have the units available whenever called upon by the Air Corps to move the gasoline and suggested that plaintiff' move his equipment, maintenance facilities, and operating crews to Borger where the refinery was located. Plaintiff was also told that Captain Phelps would, from time to time, furnish advance estimates of the amount of gasoline to be transported, but on account of the many variable factors involved, it was understood that the estimates would often be inaccurate. Flights of Army Air Corps planes from other bases frequently landed at the Kansas bases without advance notice, and the refueling of these planes often exhausted the supply on hand. It was also known by all parties present at the meeting that there would be little opportunity, if any, for plaintiff to withdraw any of his units from the service of moving the gasoline from the refinery to the air bases. The high octane fuel was specially prepared for the B-29 bombers and could not be used if contaminated in any way. The trailers in which the gasoline was hauled had to be kept clean at all times, and the fuel was regularly inspected to see that it was free from contamination. If a trailer was used for hauling any other commodity, it had to be steam-cleaned before the operator would be permitted to use it for transporting aviation fuel.
As a result of the discussion between the parties, it was agreed that plaintiff would supply a minimum of 28 units for the transportation of the gasoline from the Phillips Refinery to the three air bases at the rail rates, converted to a cents per gallon basis, plus demurrage on the terms stated above; that plaintiff would immediately move his maintenance facilities, units, and operating crews to Borger, Texas, and maintain the equipment there for the purpose of transporting the gasoline as and when directed to do so by the Air Corps. It was also understood that Mr. Mims and Captain Phelps would assist plaintiff by obtaining the permits required by him for operating over the routes involved and that they would also prepare and have filed for plaintiff a temporary tariff providing for the rates that had been agreed upon at the meeting.
When the meeting was held, the bridge over the Canadian River on State Highway 111 between Borger, Texas, and *447 Dumas, Texas, was out, and it was known that this would require plaintiff to detour an additional 50 miles on tbe route from Borger to tbe three bases. Consequently, it was further agreed that the additional mileage made necessary by the detour would be computed, as in the case of the other mileage, on the basis of the rail rates, converted to a cents per gallon rate. The bridge was closed to traffic from June 25,1944 to August 1, 1944, and also during the period from April 3,1945 to April 10,1945.
8. At the July 7 meeting, Major Freeman stated that in view of the critical situation the Army Air Corps wanted plaintiff to start transporting gas to the Kansas air bases on the following morning. Immediately after the meeting, therefore, plaintiff telephoned his office at Plainview, Texas, and made arrangements for moving his repair facilities, transportation units, and personnel to Borger, Texas. Plaintiff then went directly to Borger where he leased a building to house his repair facilities. He also rented rooms in a hotel and in several tourist courts for the accommodation of his personnel. Plaintiff began hauling gasoline to the air bases on July 8, 1944, the first delivery being made on the evening of that day.
9. Captain Phelps and Mr. Mims prepared for plaintiff a temporary tariff No. MF-ICC No. W-12, which was filed with the Interstate Commerce Commission on July 17, 1944. This tariff was issued July 11, 1944, effective July 11, 1944, and established rates on minimum shipments of 3,000 gallons of gasoline from Phillips, Texas, to the U. S. Army Air Base, Liberal, Kansas, of 1.20 cents and 1.70 cents per gallon, and rates of 1.98 cents and 2.48 cents per gallon on such transportation from Phillips, Texas, to the U. S. Army Air Base near Dodge City, Kansas. The higher rates of 1.70 cents and 2.48 cents per gallon were applicable only during the period when the bridge over the Canadian River, as above referred to, was out. The tariff provided that it was due to expire on August 9, 1944.
The rates specified in the temporary tariff were supplied by Mr. Mims, but Captain Phelps assisted him in the preparation of the tariff.
*448 The tariff contained no authorization for charging demurrage.
10. Mr. Mims and Captain Phelps likewise prepared for plaintiff a temporary tariff, MF-ICC No. W-13, which was issued August 4,1944, and became effective on the same date. It provided for a rate of 2.25 cents per gallon on a minimum shipment of 3,000 gallons of gasoline in bulk, in tank trucks from the Phillips Kefinery near Borger, Texas, to the U. S. Army Air Base at Pratt, Kansas. This tariff, which was filed with the Interstate Commerce Commission on August 10, 1944, expired on September 2,1944, and was never thereafter extended. Defendant’s Exhibit 12, which contains a detailed schedule of the shipments of gasoline by plaintiff, shows that plaintiff did not haul gasoline from Phillips to the Army Air Base at Pratt, Kansas, after September 1,1944.
No reference to demurrage was made in the tariff.
11. Although he did not participate in the preparation of the temporary tariffs described above, plaintiff knew that they were being filed for him and believed that they provided for rates that were equivalent to the rail rates in effect at that time between the points involved in accordance with the agreement of July 7, 1944.
Captain Phelps and Mr. Mims believed that the rates provided for in the temporary tariffs were equivalent to the applicable rail rates, but there is no explanation in the record as to why no provision was made in either of such tariffs for demurrage.
12. During the time of the transactions involved here, it was customary for carriers transporting gasoline for the Army Air Coi'ps to operate for 30 days under a temporary or emergency tariff, and then to apply for an extension of the tariff for the duration of the war.
On July 14,1944, plaintiff made a sworn application which was filed on July 22, 1944, with the Interstate Commerce Commission. In this document, plaintiff stated that he was filing an application for authority to transport gasoline in bulk in tank trucks from Phillips, Texas, to the air bases at Liberal and Dodge City, Kansas, and requested authority from the Commission to publish, on one day’s notice, a tariff providing for the same rates as were specified in his temporary tariff No. MF-ICC-W-12 (Finding 9). Plaintiff’s application read in part as follows:
*449 (c) comparison of applicant’s proposed rates
The rates herein proposed by the applicant are based upon the prevailing rate in the territory involved and are the rates agreed upon by the Petroleum Traffic Section, Air Service Command, Patterson Field, Dayton, Ohio.
Plaintiff employed an attorney for the purpose of preparing and filing the application and the proposed tariff, but his attorney was assisted to some extent by Mr. Mims. There is no explanation in the record as to why no reference was made in the application or the proposed tariff to demurrage.
On the same date that plaintiff’s sworn application was executed, i. e. July 14, 1944, the following letter was sent from the office of Captain Phelps to Mr. Mims:
You recently secured temporary rights for an operator to transport aviation gasoline from Borger, Texas, to Army Air Field near Liberal and Dodge City, Kansas.
Inasmuch as this service will be required permanently, it is requested that this operator be granted duration rights for these hauls.
Carriers with present authority do not have sufficient equipment to provide needed service, and have repeatedly fallen down necessitating the use of badly needed tank cars on normal truck hauls.
At the time the letter was written, Captain Phelps knew that plaintiff was applying for authority for transportation of the gasoline from the Phillips Befinery to the Kansas air bases at the same rates that were provided for in the temporary tariff.
On August 5, 1944, the Interstate Commerce Commission denied plaintiff’s application, because the Transportation Corps of the Army Service Forces had objected to the proposed rates. By telegram of August &, 1944, from the ICC, plaintiff was notified that his application had been denied because of objections made by the War Department. The telegram suggested that he file an application for publication of the proposed rates after 30 days’ notice.
When the Army Air Corps officials at Wright-Patterson Field heard of this action, the Chief of Traffic for the Army Air Corps was requested to intercede with the Transportation Corps of the Army Service Forces and to request that the *450 objection be withdrawn. The Army Air Corps took the position that plaintiff’s services were badly needed and that plaintiff should be allowed to publish a tariff authorizing rates as applied for until the Air Corps could determine the actual costs of plaintiff’s operations. Accordingly, the Transportation Corps withdrew its objections and on August 23, 1944, the ICC entered an order authorizing plaintiff to publish and file with the Commission a new tariff in accordance with his application, the tariff to bear the expiration date of December 31, 1944, and to be made effective upon not less than one day’s notice to the Commission and to the public.
Thereafter, on September 1, 1944, plaintiff’s tariff MF-ICC No. 2 was issued, to become effective September 5, 1944. This tariff specified that it was to expire on December 31, 1944, unless sooner canceled, changed, or extended, and authorized plaintiff to transport gasoline in bulk, in tank trucks: for account of the United States Government on Government bills of lading, with pick-up and delivery service and' with a minimum load of 3,000 gallons, at the following rates
(a) From the Phillips Refinery near Borger to the U. S. Army Air Base at Liberal, Kansas, 1.20 cents per gallon;
(b) From the Phillips Refinery near Borger, Texas, to the United States Air Base near Dodge City, Kansas,, 1.98 cents per gallon.
Pursuant to an order entered by the Interstate Commerce Commission on November 29, 1944, Supplement No. 1 to plaintiff’s tariff MF-ICC No. 2 was issued December 27,1944,. to become effective December 30,1944. This supplement extended the expiration date of the tariff from December 31,. 1944 to December 31,1945.
13. During the meeting at Amarillo on July 7,1944, Major Freeman stated that the Army Air Corps had a number off surplus tractor-trailer units that were available for lease to motor carriers hauling gasoline to the air bases and that he-would arrange to have some of these units sent to the territory under Captain Phelps’ jurisdiction. Sometime later during the summer, Captain Phelps informed plaintiff that *451 when the G overnment-owned units were received, 12 of them would be leased to plaintiff at a rental of 20 cents per loaded mile or 10 cents per running mile. It was explained that the units were the train type, consisting of one large tractor and two trailers, each having a capacity of 4,000 gallons and equipped with pumps, dispensing equipment, and meters. The proposed rental rate quoted to plaintiff was 5 cents per running mile for the tractors and 2% cents per running mile for each of the trailers. Captain Phelps also informed plaintiff that the prevailing rate charged by other carriers who hauled gasoline for the Air Corps in such Government-owned equipment was 14 cents per running mile or 28 cents per loaded mile for each trailer, plus a terminal charge of $8.40 for each trailer. Plaintiff understood that when he began hauling gasoline in the Government-owned units, he would receive 56 cents per loaded mile per unit, plus terminal charges amounting to $16.80, and that he would pay a rental of 20 cents per loaded mile per unit.
. At or about the time these discussions were taking place, Captain Phelps also notified plaintiff that he had received complaints from the Transportation Corps, through the Air Corps, that the rates charged by plaintiff and other carriers in that territory were excessive and out of line with rates charged by carriers elsewhere. At the request of Captain Phelps, plaintiff and a number of other motor carriers transporting aviation gasoline submitted statements showing the costs of their operations. Although the evidence does not disclose what costs were shown, Captain Phelps was later notified that the rates were too high and would have to be reduced to a rate of 14 cents per running mile, plus a terminal charge of $8.40 for each trailer. This information was conveyed to plaintiff by Captain Phelps, who stated that the-Air Corps had determined, on the basis of the rates charged by a number of other carriers, that the 14-cent per running-mile rate should be put into effect in Captain Phelps’ territory. At that time, plaintiff refused to agree to haul at the reduced rates, stating that he could not do so without suffering a substantial loss.
On or about September 16,1944, after Captain Phelps had ■ received about 60 of the surplus Government units, he tele *452 phoned plaintiff’s office in Plainview and, during plaintiff’s absence, talked with plaintiff’s bookkeeper and dispatcher. Captain Phelps stated that he would have to have a letter from plaintiff before the Air Corps would consider leasing any of the surplus equipment to the plaintiff. Over the telephone he dictated the following letter, which was typed and signed as shown below by plaintiff’s bookkeeper and mailed to Captain Phelps on September 18, 1944.
Newman Motor Co.
Plainview, Texas
September 18, 1944.
Major Edwin F. Phelps,

Transportation Officer,

Army Air Force, Transportation Office,

Amarillo, Texas.

Dear Sir: This is to advise we have started transporting gasoline from Borger Texas to Liberal and Dodge City Army Air Bases on the 14 cents per mile plus $8.40 rate based on load of 4000 gallons. We have instructed our attorney to file new Tariffs, which will be done immediately.
This new rate as per our agreement will become effective as of Sept. 16, 1944.
Yours Truly,
Newman Motor Co.
By: /%/ L. F. LaFont.
The letter was transmitted by Captain Phelps, through the Air Corps, to- the Transportation Corps, Army Service Forces.
Plaintiff, who was not in Plainview when the letter was written, claims that it was not authorized by him. However, he saw a copy of the letter a few days later and took no action to revoke or repudiate the-letter:
There is a direct conflict in the evidence as to the agreement made by plaintiff and Captain Phelps, in discussions prior and after the writing of the letter, respecting a reduction in the rates charged by plaintiff. He contends that the reduced rates were to be applicable only when he transported .gasoline in the Government-owned units, while defendant -claims that.plaintiff agreed to reduce the rates irrespective •of whether any of the surplus units were leased to and op *453 erated by plaintiff. However, the greater weight of the evidence shows that the letter was written pursuant to an agreement between Captain Phelps and plaintiff that if the 12 Government-owned units were leased to plaintiff on the terms previously quoted to him, plaintiff would make the reduced rate quoted in his letter applicable to all units operated by him for hauling gasoline for the Air Corps to the three bases and would file a new tariff providing for the reduced rate. After the 12 surplus units were inspected by Captain Phelps, he notified plaintiff that none of the tractors were suitable for use on the highway. Since plaintiff had no tractors large enough to pull the heavy Government-owned trailers, none of the surplus units.were leased to him at that time.
14. Sometime prior to February 1,1945, plaintiff, with assistance of the ODT, purchased four, new, 15-ton tractors, each of which was of sufficient size and power to pull two of the Government-owned trailers. Because of their size, the new tractors could not be used under peacetime conditions, their weight being in excess of the allowable load limits. On February 1,1945, after the tractors had been acquired, plaintiff and defendant entered into a written lease contract by the terms of which defendant leased to plaintiff four of the 4,000-gallon trailers at a rental rate of $.0125 per mile per trailer.
The contract provided in part as follows:
Article 3. The term of this lease shall begin on 1 February 191¡£ and shaE end upon the return of the equipment to the Government at Liberal Army Air Field, Kansas or at such other place as the Contracting Officer may designate, but in no event to exceed the time necessary to complete the Lessee’s principal contract.
* * * * *
Article 11. Between the time of delivery of the equips ment to the Lessee at Liberal Army Air Field, Kansas or at such other place as the Contracting Officer may designate pursuant to Section 3, the Lessee shaE be solely responsible for any loss or destruction of the equipment, irrespective of whether such loss or destruction results from the failure of the Lessee to exercise reasonable care. Such responsibility shall be measured by the value of the equipment less the amount deter *454 mined by the Contracting Officer to represent reasonable wear and tear for the period during which such equipment was used. * * *
On June 15, 1945, by a supplement to the lease contract, 12 additional 4,000-gallon trailers were leased to plaintiff by defendant on the same terms.
15. From time to time, Captain Phelps had complained to plaintiff that the rates authorized in plaintiff’s tariffs were too high, stating that these excessive rates had caused considerable criticism. Captain Phelps insisted that plaintiff reduce the rate on the haul from the Phillips Refinery to the air base at Liberal, Kansas, from 1.20 cents to 1.05 cents per gallon and that he also reduce the rate on the haul from the refinery to the air base at Dodge City, Kansas, from 1.98 cents per gallon to 1.68 cents per gallon. On or about May 26, 1945, plaintiff agreed to make the reduction and on that date published his tariff MF-ICC No. 3, canceling Tariff MF-ICC No. 2. This tariff became effective July 1,1945, and stated that it was to expire on December 31, 1945, unless it was canceled, changed, or extended prior to that time. The tariff, which was in effect at the time plaintiff ceased transporting gasoline for the Air Corps, reduced plaintiff’s rates to 1.05 cents per gallon on the haul to Liberal and to 1.68 cents per gallon on the haul to Dodge City.
16. Bills of lading covering all the gasoline transported by plaintiff to the air bases were issued by Captain Phelps’ office. Plaintiff kept his books at Plainview and issued his bills there. The rates used in compiling plaintiff’s bills were supplied by Captain Phelps from time to time by telephone from his office in Amarillo to plaintiff’s office in Plainview. During the period from July 8,1944 through September 15, 1944, plaintiff’s bills were based on the rates provided for in his tariffs filed with the Interstate Commerce Commission. From September 16, 1944, (the date specified in plaintiff’s letter of September 18,1944) through August 16, 1945, plaintiff billed the Government at the rate of 1.05 cents per gallon for the shipments from the refinery to the air base at Liberal, Kansas, and at the rate of 1.68 cents per gallon on shipments from the refinery to the air base at Dodge City, Kansas. This was done on instructions *455 from Captain Phelps and over plaintiff’s protest. These rates were provided for in the tariff filed by plaintiff on May 26, 1945, effective July 1, 1945 (Finding 15).
Plaintiff was aware of the fact that he was being paid for the gasoline transported after September 16, 1944, at rates which were less than those provided for in his tariffs. He frequently protested to Captain Phelps that he was losing money in hauling gasoline at such rates and stated that when the work was completed he proposed to file a master claim for the difference between what he was being paid and the amount he was entitled to on the basis of the agreement concluded at the meeting on July 7,1944.
17. The highway mileage, one way, over the routes traveled by plaintiff from the refinery to the Kansas air bases was 118 miles to Liberal, Kansas, 202 miles to Sears Junction, and 252 miles to Pratt, Kansas. The rail mileage between the refinery and the Kansas air bases was considerably greater than the highway mileage, because of the circuitous route that had to be followed in moving railway tank cars from the refinery to any of the three bases. The rail mileages, one way, from the refinery to the Kansas air bases, were 206.7 miles to Liberal, Kansas; 321.1 miles to Sears Junction, and 339.6 miles to Pratt, Kansas.
The parties have agreed that the rail rates in effect at the time the gasoline was transported were equivalent to the following rates: 1.716 cents per gallon from the refinery to Liberal, Kansas; 1.716 cents per gallon from the refinery to Pratt, Kansas, and 2.244 cents per gallon from the refinery to Dodge City, Kansas. Plaintiff did not learn until after this action was filed that the rates authorized by his published tariffs during the period from July 11,1944 to July 1, 1945, were less than rates equivalent to the rail rates between the refinery and the Liberal Air Base and between the refinery and the air base near Dodge City.
Had plaintiff billed the Government at rates equivalent to 14 cents per running mile over the highway routes used by him, plus a terminal charge of $8.40, (the rate proposed by the Army Air Corps), such rates would have been 1.036 cents per gallon to Liberal and 1.624 cents per gallon to Sears Junction.
*456 The evidence does not disclose how Captain Phelps arrived at the rates of 1.05 cents per gallon on the haul from the refinery to Liberal and 1.68 cents per gallon on the haul from the refinery to Dodge City, Kansas. These rates were used in computing plaintiff’s bills for gasoline hauled after September 16,1944, and were authorized in the reduction tariff, which plaintiff filed with the ICC on May 16,1945 (Finding 15). Such rates are somewhat higher than rates computed on the basis of a charge of 14 cents per running mile, plus a terminal charge of $8.40. However, a rate of 1.05 cents per gallon is equivalent to a rate of 14 cents per running mile, plus a terminal charge of $8.40, if it is computed on the basis of a highway mileage from the refinery to Liberal, Kansas, of 120 miles instead of 118 miles. The same is true of a rate of 1.68 cents per gallon computed on a mileage of 210 miles instead of 202 miles to Sears Junction.
18. On June 24,1945, two of the Government-leased trailers and an accompanying dolly were damaged beyond repair. The damaged vehicles were part of a unit operated by a driver employed by plaintiff. Under the terms of the lease agreement, plaintiff was responsible for the loss of the leased equipment irrespective of whether the loss resulted from his failure to exercise reasonable care. Pursuant to the terms of the lease contract, the defendant made a report of survey and on March 19,1947, wrote plaintiff, advising him that he was liable under the contract for the sum of $9,663.49 for the destruction of the equipment.
Plaintiff did not pay the amount demanded at that time, but in this action, he has admitted that he is liable to defendant in the said sum of $9,663.49 for the loss of the equipment.
19. On August 2,1944, a transport truck, operated by one of plaintiff’s employees, overturned en route from Borger, Texas, to Liberal, Kansas, losing 2,812 gallons of gasoline belonging to defendant. The value of the gasoline was $295.26, and on May 2, 1947, the defendant made a demand on plaintiff for payment of the value of the gasoline. Plaintiff has not paid the amount demanded but in this action, he admits that he is indebted to defendant in the sum of $295.26 for the loss of the gasoline.
*457 20. During the period from January 1947 to March 1948, Captain Phelps was employed by plaintiff. During a portion of that time, he worked with plaintiff’s attorney in the preparation of a claim against the Government for the difference between the amount plaintiff was paid and the amount claimed by him. Plaintiff’s claim, which was set forth in a letter signed by him and mailed to the General Accounting Office on April 28, 1948, read in part as follows:
We have had considerable correspondence with your office in reference to your claim against L. B. Newman et al for the loss of Government trailers in the total sum of $9,668.49. My associates and I also have a claim against the Government in connection with the identical haul from which your claim arose for underpayment of transport charges for aircraft fuel. We have called these claims to the attention of various representatives of the Government but have never known ]ust how the claims should be filed. In view of the fact that our claim arose from the identical transaction from which your claim against us arose, we feel that the opposing claims should be considered together.
*****
The Army was having considerable difficulty getting this aircraft fuel transported at that time and when the proposition was first made to me by the Army’s representative and the representative of the Interstate Commerce Commission, I explained to them that I did not have sufficient equipment and personnel to transport this fuel but that I would do my best to keep that fuel moving during the emergency. It was agreed between me, the representative of the Army Air Forces and the Interstate Commerce Commission representative that for the haul from Borger, Texas, to Liberal, Kansas, the rate of $.0170 and from Borger, Texas, to Dodge City, Kansas, the rate of $.0258 was fair.
Prior to the haul of this fuel, the representative of the Army Air Forces and the representative of the Interstate Commerce Commission demanded that we file a tariff with the Interstate Commerce Commission showing those rates, and this was done with the tariff effective September 5,1944. You will understand that my associates and I went to considerable expense to establish terminal facilities both at point of origin of this fuel and en route, to properly dispatch and police the hauls. In addition to this, due to the slow and cumbersome methods then in existence with regard to the freight charges, we were *458 obliged to discount all Government bills of lading with a finance company in order to meet payroll and other current obligations.
Shortly after we started making these hauls and while the tariff above described was in full force and effect, we were notified by the Army Air Forces officials that the rates of pay were being reduced from the above tariff rates to $.0120 to Liberal, Kansas, and $.0198 to Dodge City, Kansas. A short time after this, the rates of pay were again arbitrarily reduced to a lower figure while the above tariff was in full force and effect. This was done in spite of the fact that the tariff was filed and the rates of pay were thereby fixed.
In view of the national emergency then existing, my associates and I continued the hauling of this fuel until hostilities ceased. We did file a tariff, effective July 1, 1945, with the Interstate Commerce Commission showing a rate of $.0105 to Liberal, Kansas, and $.0168 to Dodge City, Kansas, and hauled approximately one month under this new tariff. However, certainly we have a claim against the Government for the difference between the rate of pay actually received and the tariff in effect at that time.
Attached to this letter are Exhibits £<A” and “B”, Exhibit “A” showing the loads hauled to Liberal, Kansas, and Exhibit “B” showing the loads hauled to Dodge City, Kansas. Beneath each monthly column are shown the number of idle days of that month when we were not called upon to haul but were obliged to maintain personnel and equipment in readiness at all times. Over the end months period, we were forced to remain idle a total of 61 days on the Liberal haul and 109 days on the Dodge City haul.
At this time we are filing our claim, in connection with the claim of the Government, for undercharges on the difference between the rates of pay actually received and the tariff in effect at that time. Our records indicate that we hauled 3,933 loads to Liberal, Kansas, and 1,363 loads to Dodge City, Kansas.
* $ $ $ ‡
Attached to the letter were schedules showing that during the period from September 16, 1944 through June 30, 1945, there were 61 days on which plaintiff was idle. However, no claim was made in the letter for the payment of demurrage or standby time.
21. Since plaintiff’s petition in this action was filed September 18, 1950, part of plaintiff’s claim is barred by the *459 statute of limitations. Excluding the claim for demurrage and the claims barred by the statute of limitations, the parties have stipulated that if plaintiff is entitled to recover the difference between what he was paid and the amount he would have received had he been paid on the basis of rates equivalent to the rail rates during the period September 19, 1944 through August 16, 1945, the amount of the recovery would be $170,424.73.
It has also been stipulated that if plaintiff is entitled to recover the difference between what he received and the amount he would have received had he been paid at the rates provided for in his tariffs during the period from September 19,1944 through August 16, 1945, the amount of the recovery would be $45,067.96. This figure does not include the claim for demurrage or the claims barred by the Statute of Limitations.
22. As stated in Finding 2, the Phillips Refinery produced from 18 million to 20 million gallons of aviation gasoline monthly during the period pertinent to this action. In addition to the gasoline transported by rail, a number of motor carriers were engaged in hauling the aviation gasoline to destinations scattered over an area that covered portions of several states. The refinery loaded the carrier’s units in the order in which they arrived there. As a result, plaintiff’s trucks frequently had to remain in line until as many as 30 or 40 units belonging to other carriers had been loaded. Plaintiff’s trucks were also delayed from time to time at the refinery while railway tank cars were being loaded with gasoline. On some occasions the refinery was shut down entirely. The refinery yard was not paved, and on rainy days plaintiff’s delays were increased because of the time required for getting the trucks in and out of the yard. It was often necessary to use heavy tractors for pulling the trucks out of the mud.
•' Plaintiff’s units were frequently detained while waiting to unload the gasoline trucks at the three bases. As stated in a preceding finding, the facilities for unloading and storing gasoline at the three bases were small in relation to the quantities of gasoline consumed, and plaintiff’s trucks had to stand by on many occasions until storage could be made *460 available by the refueling of planes. This condition was aggravated and the delay was increased during bad weather when the planes were grounded. Although most of the gasoline was brought to the three bases in trucks, railway tank cars were also used. When plaintiff’s trucks arrived at one of the fields at a time when railway tank cars were on the siding, plaintiff’s operators had to stand by until the tank cars were unloaded. The limited extent of the unloading facilities at the bases is indicated in the following letter, which was written to plaintiff by the Transportation Officer at the air base in Dodge City on September 26,1944:
An inspection of unloading facilities shows that the average time for defueling and unloading tank trucks is forty minutes. Demurrage is charged for time beyond one hour. The unloading capacity at any one period of time is four trucks. Bequest your tank trucks be dispatched so as not to have more than four trucks at our unloading dock at any one time.
On account of the many factors affecting the quantity of gasoline used at the Kansas air bases, there were times when only a portion of plaintiff’s units were needed to meet the demands for gasoline. There were also periods when all of plaintiff’s units were idle. Sometimes after a trained squadron was transferred to duty overseas, there would be a lag before a new group of student trainees began flying the bombers.
.23. With respect to the demurrage claimed by him, plaintiff did not keep records showing the number of hours, in excess of the free time allowed, that were required to load the units after they had been dispatched to the refinery and for unloading them after they arrived at the three destinations. Instead, plaintiff has computed his demurrage claim by deducting the sum of the estimated travel time for the transporting units, an allowance of two hours per trip for servio ing and repairing the units, and free time amounting to two hours per trip, from the product of the total number of hours that elapsed from September 19,1944 through August 16, 1945, and 28 (the number of units he was required to keep on hand to transport the aviation gasoline to the three air bases).
*461 From bis experience in the operation, plaintiff determined that his trucks traveled at an average speed of 35 miles per hour in level country and 28 miles per horn in hilly country. He adopted a figure of 30 miles per hour and multiplied that by the mileage to and from each base to arrive at the average traveling time required on each trip. The product was then multiplied by the number of trips made to each base, as shown by the bills of lading, to arrive at the total traveling time consumed.
■ To the total travel time consumed, as thus computed, plaintiff added one hour for free loading time at the refinery and one hour free time for unloading at destination on each trip, plus two hours per trip as the estimated time required .to service and repair each unit.
Under ideal conditions, a tank trailer could be loaded in 15 minutes and unloaded in about the same time. On the average, it required plaintiff’s maintenance employees about 45 minutes to see that the tires of each unit were properly inflated, to inspect the unit for mechanical trouble, and to fuel each tractor for a trip. To the average time needed for servicing each unit, plaintiff added 1 hour and 15 minutes per trip to accumulate the total estimated time required for major repairs. Plaintiff kept one or two idle tractors on hand at Borger to prevent delay when any of the tractors in use required major repairs.
Although plaintiff was required to keep 28 units available, at all times for hauling the gasoline, there were times when he had as many as 54 units engaged in. moving the gasoline: to the three destinations.
In plaintiff’s computation, the total number of hours lost on the operation were 142,484.054, and his total demurrage-claim for the period from September 19,1944 through August. 16,1945, amounts to the sum of $712,420.27.
In the claim filed with the General Accounting Office on April 28, 1948, plaintiff stated that during the period from September 1944 through June 1945, he was idle 61 days on. the haul to Liberal, Kansas, and 109 days on the hard to Dodge City, Kansas. From an examination of Defendant’s Exhibit 12, it appears that there were approximately 25 *462 days between September 1944 and August 1945 when plaintiff did not transport gasoline to any one of the three bases.
The evidence is sufficient to establish that there were times when all or a portion of plaintiff’s units were idle because the refinery was shut down or because the defendant did not call upon plaintiff to haul gasoline in such idle units. However, the evidence does not provide a sufficient basis for arriving at the amount of idle time not chargeable to the defendant. Consequently, the amount of demurrage to which the plaintiff is entitled, under the terms of the agreement entered into between the parties, cannot be determined with reasonable accuracy.
24. Plaintiff admits that he is indebted to the defendant In the sum of $9,958.75 for the destruction of defendant’s equipment and for the loss of gasoline as described in Findings 17 and 18.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the United States thirty-five thousand one hundred nine dollars and twenty-one cents ($35,109.21).